El Pueblo de Puerto Rico, querellante, *v.* Juan Valldejuli Rodríguez, querellado.

Núm. 8.—*Sometido:* Julio 10, 1941.*  *Resuelto:* Julio 29, 1941.

*R. A. Gómez, Fiscal del Tribunal Supremo* y *Luis Negrón Fernández, Fiscal Auxiliar,* abogados del querellante; *R. Cuevas Zequeira* y *Román Díaz Collazo,* abogados del querellado.

* Vista del caso en su fondo.

Juez Asociado Señor Travieso.

Los hechos que dieron lugar a la formulación de una querella por desacato contra el abogado Juan Valldejuli Rodríguez, son los siguientes:

El día 17 de enero de 1940, se celebró ante esta Corte Suprema la vista del recurso de *certiorari* interpuesto por el Dr. Carlos M. de Castro contra la Junta de Comisionados del Gobierno de la Capital, para la revisión de la resolución de dicha Junta destituyéndole del cargo de Administrador de la Capital. La representación de la Junta estuvo a cargo del querellado.

En la mañana del día siguiente al de la vista, el querellado compareció personalmente ante el Juez Asociado de esta corte, Sr. De Jesús, en su despacho en el edificio del Capitolio Insular, donde tiene su asiento la Corte Suprema de Puerto Rico, en momentos en que dicho juez se encontraba allí en el desempeño de funciones de su cargo, y le manifestó: que en la tarde anterior, al salir el querellado de la oficina del márshal, después de terminada la vista del mencionado caso de certiorari, mientras caminaba por la rotunda del Capitolio, una persona medio oculta detrás de una de las columnas le apuntó con un revólver, dándose a la fuga cuando el querellado sacó el que portaba; que él no pudo reconocer a dicha persona, pero observó que usaba espejuelos de color ámbar; que esa misma tarde, un amigo suyo le informó que ese mismo día había visto a la persona que le apuntó con el revólver, en una mesa en un café, en la parada 15 en Santurce, en compañía del Dr. De Castro y de su esposa, quienes habían asistido a la vista del caso.

Después de oír el relato que le hiciera el querellado, el Juez Sr. De Jesús le preguntó si era su deseo que él presentase el asunto ante el tribunal, a lo que el querellado respondió: "Como usted quiera." Considerando que el Sr. Valldejuli había venido a verle con ese propósito, e interpre-

tando que su deseo era que él sometiese el asunto a la consideración del tribunal, esa misma tarde, estando reunidos todos los jueces en la sala de conferencias para discutir y resolver asuntos ya sometidos, el Juez De Jesús dió cuenta al tribunal de lo que le había informado el querellado, para que el tribunal tomase las medidas que creyese oportunas y justas.

Considerando que el querellado es un abogado en ejercicio y como tal un funcionario de la corte, a quien la corte está obligada a proteger contra cualquier agresión u otro acto de violencia que se intente cometer o se cometa contra su persona por motivo de palabras pronunciadas o actos realizados en la defensa de un asunto pendiente ante la corte, ésta creyó que los hechos denunciados por el Sr. Valldejuli al Juez De Jesús y por encargo de aquél sometidos al tribunal, revestían tal gravedad, que de ser ciertos podrían constituir un desacato al tribunal, de acuerdo con lo resuelto en *In re. Castro,* 52 D.P.R. 139, 140, en el que el mismo abogado aquí querellado fué agredido bajo circunstancias muy parecidas a las descritas por él en su relato al Juez Sr. De Jesús; y en cumplimiento de su deber de proteger al funcionario que alegaba haber sido víctima de un atentado y de velar por su propio prestigio y dignidad, la corte asumió jurisdicción sobre los hechos denunciados por el querellado y ordenó se practicara una investigación preliminar, con miras a castigar por desacato a la persona que resultare culpable del supuesto atentado y a los que pudiesen resultar culpables de complicidad en el mismo.

Practicada dicha investigación, el resultado de la misma hizo dudar a la corte de que los hechos denunciados por el Sr. Valldejuli fueran ciertos y la indujo a creer que sus manifestaciones pudieran haber sido hechas con el propósito de influir indebidamente a la corte en contra de la parte opuesta a la defendida por él en el mencionado recurso de certiorari. En 24 de enero de 1940, la corte pasó el asunto al fiscal, con

instrucciones de practicar una investigación completa de los hechos y someter el resultado de la misma, con sus recomendaciones al tribunal.

En julio 13, 1940, el fiscal auxiliar de esta Corte Suprema, en cumplimiento de la orden dictada por el tribunal el día primero del mismo mes, radicó una querella en la que después de relatar los hechos que ya hemos expuesto, se hacen al querellado las imputaciones específicas siguientes:

"*Quinto:* Que los hechos relatados en la mañana del día 18 de enero de 1940 por el querellado Juan Valldejuli Rodríguez al Hon. Angel R. de Jesús, como ocurridos a dicho abogado en la tarde del día anterior, y en el sitio a que se refirió en sus manifestaciones a dicho juez, según se exponen en el párrafo segundo de esta querella, eran falsos, constándole a dicho querellado allí y entonces la falsedad de los mismos, toda vez que el referido abogado Juan Valldejuli Rodríguez, una vez terminada la vista del caso 8070 mencionado en el párrafo primero anterior, salió del edificio del Capitolio donde está instalada esta Corte Suprema, acompañado del señor Rafael Cestero, habiéndose verificado su salida y retiro del edificio desde el salón de sesiones de esta Corte hasta la oficina del márshal de la misma, y de ésta hasta el portal de salida de dicho edificio, sin que ocurriera durante dicha salida incidente alguno entre el abogado Valldejuli Rodríguez y persona otra alguna, ni persona otra alguna interviniera con él ni le amenazara ni apuntara con armas o de cualquier otro modo en el trayecto seguido por el querellado al retirarse y salir de esta Hon. Corte, y sin que dicho abogado sacara en momento alguno su revólver.

"*Sexto:* Que al hacer el querellado Juan Valldejuli Rodríguez al Hon. Juez Angel R. de Jesús el relato de los hechos expuestos en el párrafo segundo de esta querella, como ocurridos a dicho querellado, con la súplica a dicho magistrado de que trasmitiera los mismos a esta Hon. Corte, lo hizo ilegal y voluntariamente y a sabiendas de que tales hechos relatados eran falsos y de que los relataba con el propósito de tender a influir indebidamente a los jueces de esta Hon. Corte en contra de la parte opuesta a la defendida por él en el indicado litigio, o sea al apelante Dr. Carlos M. de Castro."

En julio 10 de 1941 desestimamos la moción de archivo y sobreseimiento radicada por el querellado, porque opinamos (ante, pág. 119) que "La querella expone hechos que, a nues-

tro juicio, de ser probados, serían suficientes para constituir desacato.'' En la misma fecha se celebró la vista del caso. El fiscal, después de ofrecer en evidencia el acta de la vista, en enero 17, 1940, del caso núm. 8070, sobre certiorari, y la sentencia dictada en el mismo caso en junio 28, 1940, ofreció el testimonio de varios testigos, los que declararon, en síntesis, como sigue:

Angel R. de Jesús, Juez Asociado de esta Corte Suprema, después de repetir el relato que del supuesto atentado le hizo el Sr. Valldejuli, substancialmente en la forma en que ya lo hemos expuesto, declaró: que el querellado no especificó el carácter en que le hacía las manifestaciones; que él, el testigo, entendió que se lo hacía en su carácter de juez y que vino a su oficina con ese solo propósito; que él, como persona particular, no hubiera podido hacer nada, y que por eso le dijo que tratándose de un tribunal colegiado fuera a ver al Juez Presidente; que al preguntarle al querellado si quería que él informara al tribunal del asunto, le respondió: ''Como usted quiera''; que como el querellado había venido expresamente a su oficina con ese objeto, él interpretó que su intención era decírselo al tribunal y por eso lo hizo así, y además, porque se trataba de un caso en que el tribunal tenía interés, pues la persona que hacía eso merecía un castigo, y con ese objeto creyó conveniente que el caso fuese presentado al tribunal. A preguntas del abogado defensor, contestó: que hace muchos años conoce al querellado y siempre ha tenido con él, como con cualquier otro abogado, relaciones cordiales; que el interés que él se tomó en el asunto no fué para averiguar si era cierto o no lo del incidente; que el interés que él supuso que el tribunal tendría era investigar el hecho denunciado por Valldejuli y castigar al culpable, ''porque entiendo que un abogado que viene a ejercer su profesión y es agredido al salir de la corte, merece que sea protegido por ésta''; que él hubiera procedido en la forma en que lo hizo si se hubiese tratado de cualquier otro abogado;

que .la relación que había entre el incidente relatado por Valldejuli y el debate ante la corte el día anterior es, que habiéndose hablado durante el debate de la muerte del auditor municipal, Sr. Ramírez Nadal, quien presentó los cargos contra el Dr. De Castro, él entendió que las intenciones del Lic. Valldejuli eran que se castigara al culpable del atentado contra él; que el testigo lo aceptó todo como cierto; que al oír el relato de los hechos, el tribunal creyó que eso podía influir en la mente del tribunal en cuanto a la resolución del caso, en contra del Dr. De Castro, ya que según lo relatado por Valldejuli el individuo había sido visto tomando en un café con el Dr. De Castro y su esposa; que ésa fué la relación de causa y efecto que el tribunal vió en el caso, y entendió que si lo dicho por el querellado era falso, eso constituiría desacato, y procedió a ordenar una investigación más amplia por el fiscal.

William G. Látimer, Márshal de la Corte Suprema, declaró: que estuvo en el salón de sesiones durante toda la vista del caso entre De Castro y la Junta de Comisionados y entre las personas que vió allí recuerda al Dr. De Castro, su esposa, el Lic. Tirado Géigel, un guardián del Capitolio de apellido Cristian y dos o tres personas más que no pudo identificar; que al terminar la vista salió hacia su oficina por la puerta que da a la rotunda, siguiendo por el pasillo del elevador y atravesó hasta la rotunda; que estando allí alcanzó a ver al guardián Cristian que caminaba en dirección sur, o sea hacia el vestíbulo que da a la Avenida Ponce de León; que fué a su oficina para ver si estaban allí los abogados del Sr. De Castro, para informárselo a éste, y que después de informarle que no estaban allí, regresó a su oficina; que vió al querellado antes, durante y después de la vista; que Valldejuli llegó acompañado del Sr. Cestero, y después de la vista lo vió ir a la Secretaría; que después lo volvió a ver cuando regresó a su oficina, donde estuvo unos minutos, y de allí salió acompañado de Cestero hacia el pa-

sillo de Secretaría; que no volvió a ver a Valldejuli hasta el día siguiente a las 11 a. m. cuando vino a su oficina a informarle lo que le había ocurrido el día anterior y a rogarle que pasara al sitio de los hechos relatados por él, llevándole al frente de las columnas hacia la salida del vestíbulo sur; que allí el querellado le relató el caso diciéndole: que cuando él salía, bajó por la escalera del pasillo de la Secretaría, siguió y en el primer hueco entre columnas que dan al vestíbulo sur, al virar, el Sr. Cestero le dijo "Cuidado" o "Mira" y al virar la cara alcanzó a ver un brazo que sobresalía y parte de una cara con un lente de concha, y al ver eso él se acordó de que iba armado y sacó su revolver y se le cayeron los libros, y al sacar él el revólver el brazo de la persona que estaba detrás de la columna desapareció, no pudiendo él ver la persona; que al terminar el Sr. Valldejuli su relato, el declarante le dijo: "¿Qué desea hacer?", y le respondió: "Yo he venido a ver a alguno de los jueces"; que él le preguntó: "¿Al Presidente o alguno de los otros jueces?" y él le contestó: "A cualquiera, al que esté desocupado, al que me pueda ver"; que siendo el Juez Sr. De Jesús el único que estaba en condiciones de poder recibirlo, él lo pasó a su despacho; que volvió a ver a Valldejuli media hora más tarde y estuvo presente cuando él le hizo la misma relación de hechos al Subsecretario Marrero y al taquígrafo Vallecillo, y que lo único que añadió con respecto al supuesto asaltante fué: "Me parece que si yo lo viera lo reconocería."

El Lic. Borinquen Marrero, Secretario Auxiliar de la Corte Suprema, declaró: que actuó como Secretario en la vista del caso de certiorari y recuerda haber visto en la sala de sesiones al Dr. De Castro, a una señora que supo después era su esposa, al Lic. Tirado Géigel, al Sr. Cestero, al Sr. Marcos Morales, y a la derecha el Sr. Cristian, "watchman" del Capitolio. Después de relatar lo que le contó Valldejuli, substancialmente en la misma forma en que lo hiciera el márshal Látimer, continuó declarando el testigo, que el Lic.

Valldejuli no le dijo que supiera el motivo por el cual trataban de atacarle, pero le dijo que había tenido conocimiento de que la tarde antes el Dr. De Castro, su esposa y un señor estaban tomando en un café en Santurce; que dijo también que había visto a la persona que huía, que era alta, más bien delgada, de tipo trigueño y usaba gafas oscuras.

Jesús Avilés Román, conserje auxiliar de la Corte Suprema, declaró: que el día de la vista del caso del Dr. De Castro vió al Lic. Valldejuli como de 1.30 a 2.00 p.m. cuando llegó. a la corte acompañado del Sr. Cestero, y lo volvió a ver después de la vista cuando salía de la secretaría hacia la calle por el pasillo largo; que el declarante estaba sentado en el banco junto al portón de hierro, donde acostumbra estar pendiente a las llamadas de las oficinas, y estando allí vió salir a Valldejuli con Cestero, para afuera, por el mismo pasillo que hay de Secretaría para la parte sur del Capitolio, hacia la Avenida Ponce de León; que mientras vió salir a dichos dos señores no ocurrió nada que le llamara la atención; que no vió que ocurriera nada; que los dos salieron juntos y pasaron la antepuerta para salir a la Avenida, en forma normal, andando; que no vió a nadie correr y no notó nada extraño; que no recuerda haber oído ruido alguno, ni cosas que cayeron al suelo, ni gritos; que conoce a Juan Cristian y lo vió por aquellos alrededores.

Juan Cristian, declaró: que en la fecha de los sucesos que se investigan, él era empleado de la Cámara de Representantes, como guardián vigilante; que estuvo presente en la vista relacionada con el Municipio de San Juan, porque él acostumbraba bajar todas las tardes a presenciar los juicios ante la Corte Suprema, como espectador, y estuvo en dicha vista hasta su terminación; que después de terminarse la vista vió al Lic. Valldejuli cuando salía de la Secretaría; que el declarante estaba en la segunda puerta que da frente a la salida que va a la Avenida Ponce de León, y desde allí vió a Valldejuli y a otras personas salir de la Secretaría con

unos papeles, y bajó la escalinata de la Secretaría y pasó la primera puerta hacia afuera del Capitolio, "lo vi desde que bajó la escalinata hasta que salió fuera del Capitolio"; que no vió que ocurriera nada en ese trayecto, ni nada que llamara su atención; que en esos momentos había alguna gente en la rotonda y un empleado de la corte sentado en un banco, en la parte adentro de la Secretaría; que durante todo el trayecto en que vió a Valldejuli y a su acompañante, los vió en actitud pasiva, hasta que bajaron y se fueron, hablando, por la segunda puerta de la Avenida Ponce de León; que no se detuvieron en ninguna parte y que no ocurrió nada extraordinario; que los vió desde que salieron de Secretaría hasta que salieron del edificio; que conoce de vista al mensajero de la corte que aquella tarde estaba sentado a la entrada del pasillo que conduce a la Secretaría e identifica a Jesús Avilés Román como el mensajero a quien se ha referido. Repreguntado, contestó, que su deber era vigilar el edificio; que acostumbraba bajar al salón de la corte a presenciar los casos, porque le gustan los debates judiciales; que ese día, al terminar la vista como a las 4.30 p. m., se fué a la rotonda a ver salir la gente; que no sabe si alguna persona apuntó al Lic. Valldejuli, pero que él no vió nada y que nada ocurrió, "pues yo lo observé hasta que salió afuera."

El Lic. Gabriel de la Haba, abogado del Dr. De Castro en el caso, declaró: que tan pronto como se terminó la vista, salió de la corte acompañado del Lic. Rivera Zayas y se dirigió a su bufete; que no volvió a ver al Lic. Valldejuli hasta el día siguiente, cuando éste fué a verle a su oficina, visiblemente excitado y le informó que venía a verle porque le había ocurrido un suceso muy serio el día anterior en la corte. Después de relatar, como héchale por Valldejuli, la misma historia que ya conocemos, el testigo continuó declarando: que el querellado le dijo que venía a avisarle eso, porque como él era abogado del Dr. De Castro, "que alguien lo vió

bebiendo con una persona de gafas en Santurce," y que venía a rogarle que hablara con De Castro para que dejara eso porque era un hombre con hijos, muy respetuoso de la ley,. y no quería verse obligado a usar medidas drásticas en defensa propia; que él le prometió que hablaría con De Castro y que tomaría cierta determinación en caso de que lo que él le había dicho resultara cierto.

El Lic. Rafael Rivera Zayas, también abogado del Sr. De Castro, declaró solamente que al terminarse la vista del caso salió de la corte acompañado del Lic. De la Haba; que conoce a Jesús Avilés Román, mensajero de la Corte Suprema,. quien estaba, al salir el testigo de la corte, en el portón de hierro del pasillo de la Secretaría.

El Dr. Carlos M. de Castro, después de explicar detalladamente cuáles fueron sus actividades durante la mañana del 17 de enero de 1940, declaró que ese día como a las 2.10 de la tarde llegó a la Corte Suprema cuando ya había comenzado la vista de su caso contra la Junta de Comisionados de San Juan; que al terminarse la vista salió de la corte con su esposa y el Sr. José Marcos Morales, no estando seguro de si también iba con ellos el Lic. Tirado; que después de tomar su automóvil se dirigieron a San Juan, donde se encontraron con el Sr. Rafael Rivera Santiago, quien les invitó a tomar un refresco, haciendo constar que ya había dejado a su esposa con la del Lic. Tirado en la oficina de éste; que hora y media más tarde regresaron a Santurce, donde estuvieron reunidos el Lic. Tirado, José Marcos Morales, Rafael Rivera Santiago y el declarante; que de allí volvieron a la oficina del Lic. Tirado a buscar a sus respectivas esposas, dirigiéndose él a la casa del Sr. Tirado, en Isla Verde; que allí se quedaron los esposos Tirado, regresando el declarante y su esposa a su casa.

La prueba testifical ofrecida por el querellado fué la siguiente:

El Lic. Hernán Franco, ex-Fiscal del Distrito de San Juan, declaró que a fines del año 1939 en el muelle núm. 1

de la Porto Rico Line fué herido mortalmente un señor americano de apellido Irizarry, quien falleció más tarde en el Hospital Municipal, siendo acusado de dicha muerte Enrique Valldejuli, sobrino del licenciado del mismo apellido; que encontrándose el declarante en el hospital se le acercó un individuo a quien no conocía, quien dijo llamarse Irizarry, hermano del herido; que dicho individuo se expresó en términos violentos diciendo que si su hermano moría él tomaría la justicia en sus manos, refiriéndose específicamente a los Valldejuli; que el declarante le aconsejó diciéndole que un crimen no curaba otro, que para eso estaban las cortes de justicia; que poco tiempo después, habiéndose ya radicado acusación por haber muerto el herido y estando el caso señalado para juicio se le presentó otra vez el mismo hermano del interfecto, en su oficina, y le repitió lo que le había dicho anteriormente, diciéndole que si Valldejuli salía absuelto, entonces él tomaría la justicia en sus manos; que dicho individuo estaba muy violento, como desesperado; que en una conversación que el declarante tuvo más tarde con el Lic. Valldejuli le comunicó él estos hechos; que el citado Irizarry era una persona bajita, calva, de nariz como de pico de águila, para abajo, que no recuerda si los ojos eran claros o no y que su aspecto era como de judío; que tenía entre cinco pies seis pulgadas y cinco pies ocho pulgadas de estatura.

El Lic. Benigno Fernández García, ex-Procurador General de Puerto Rico, declaró que conoce desde hace muchos años al querellado; que siendo el declarante Procurador General, al vacar el cargo de Fiscal de Distrito de San Juan, el Gobernador Winship y el declarante convinieron en ofrecerle el puesto vacante al Lic. Valldejuli, quien lo declinó por el motivo de que sus intereses particulares y su clientela le impedían abandonar su bufete.

El Lic. Fernando J. Géigel, quien en el momento de la vista ocupaba el cargo de Administrador de la Capital, declaró que el día de la vista del recurso de certiorari él se

▬▬▬▬▬▬ ▬▬▬▬

encontraba como a las cinco de la tarde en su oficina; que
más o menos a esa hora llegó a su despacho el Lic. Valldejuli, muy nervioso, muy agitado, pudiendo apenas hablar y
estando muy impresionado y como que temblaba; que el declarante le dijo, "¿Qué te pasa?" y él respondió "Chico,
mira lo que me pasó, a lo que se expone uno ejerciendo la
profesión. Se juega la vida." El testigo repite lo que le
relató el Lic. Valldejuli, substancialmente en la forma en que
lo han declarado los demás testigos. Preguntado por el fiscal si el querellado le había indicado algo que pudiera tender a explicar la razón del atentado, el testigo respondió,
"Naturalmente me pareció a mí que su impresión en aquel
momento era que se debía al asunto que se ventilaba."

El testigo Rafael Cestero declaró que estuvo acompañando al Lic. Valldejuli el día de la vista del caso del Dr.
De Castro, desde que comenzó la vista hasta su terminación
y salió junto con el Sr. Valldejuli; que al salir con Valldejuli, detrás de la columna en la primera rotunda vió a un
hombre detrás de una columna, una mano con un revólver
apuntando; que él le llamó la atención y le gritó al hombre;
que entonces Valldejuli soltó los libros, caminó y sacó su revólver y el hombre cogió hacia donde había unas maderas
que estaban en reparación o algo así; que el declarante recogió los libros, se los entregó a Valldejuli y se fueron juntos hacia el Teatro Municipal, donde estaban las oficinas del
municipio, entrando Valldejuli a hablar con el "City Manager" y quedándose el declarante en la salita de espera, y
de allí salieron juntos hasta la casa de Valldejuli; que el
individuo que apuntó con el revólver era de mediana edad,
blanco, bastante bien parecido y con unas gafas grandes
puestas, y que la impresión del declarante es que dondequiera
que lo vea lo conocerá, porque lo vió cara a cara, frente a
frente; que el declarante le pidió el revólver al Lic. Valldejuli para ver si podía alcanzar a dicho individuo pero el querellado le dijo que podía estar detrás de una columna y ma-

tarlo. A preguntas del fiscal declaró que él fué el primero que se dió cuenta de lo que ocurría y al ver al individuo le gritó: "Criminal"; que dicho individuo apuntaba hacia donde caminaba Valldejuli, quien iba uno o dos pasos delante del declarante; que cuando Valldejuli soltó los libros y sacó el revólver, el declarante trató de avanzar hacia donde estaba el hombre porque lo protegía la columna, pero el hombre corrió para adentro, ligero, mientras se metía el revólver en el bolsillo derecho de su chaqueta; que no sabe dónde se metió el hombre porque había muchos cuartones y estaba obscuro y que no podía ver si el individuo salió o no; que desde que ocurrió ese suceso no ha vuelto a ver a ese individuo, quien era de mediana estatura, o sea la estatura corriente entre puertorriqueños. Y describiendo al citado individuo dijo, "Una estatura como, vamos a suponer, más bien bajito, de un hombre muy bien parecido; y sin que quiera yo, porque yo oí la declaración del Lic. Hernán Franco, apuntar el hombre, coinciden las facciones del tipo que yo vi"; que los ojos eran claros, tal y como los pintó el fiscal, color melado; que pudo darse cuenta de que los ojos eran de ese color, a pesar de que usaba lentes oscuros, porque lo primero que hizo el individuo fué quitarse los espejuelos; que no estuvo allí mucho tiempo, porque para quitarse las gafas no se toma tiempo.

Declaró el querellado en su propia defensa y después de relatar el incidente ocurrido entre él y el Sr. Enrique Castro Martínez, continuó diciendo: que el fiscal Franco lo llamó a su oficina y le dijo que tuviese cuidado porque el hermano del interfecto Irizarry le hacía responsable de la muerte de su hermano; que la única intervención que él tuvo en el asunto de Irizarry fué llevarse la familia de su hermano para el campo; que todo eso había ocurrido antes de la fecha de la vista del caso del Dr. De Castro contra la Junta de Comisionados; que el declarante estaba sobresaltado, temía por su seguridad y claro es se disponía a defenderse; que

cuando terminó la vista del caso del Dr. De Castro, adrede se quedó en el salón de sesiones, esperando que todo el mundo se fuera, porque tenía su cabeza llena de presentimientos, por lo que le había dicho el fiscal Franco "y porque también hay personas que actúan no por voluntad propia sino mandadas por la voluntad de otros"; que 15 ó 20 minutos después salió hacia afuera; que afirma solemnemente que al bajar por el pasillo de Secretaría no había nadie en todo el corredor ni en el banco; que se dirigía hacia afuera en compañía de Cestero, no recuerda si Cestero iba delante o detrás de él; que cuando pasaron la primera arcada de la izquierda, iban hacia la segunda arcada amplia del Capitolio, frente a la segunda arcada de la izquierda que equivale a la primera de la rotonda, sintió la voz de Cestero que gritó "Criminal"; que "entonces se me cayeron los libros o algunos libros y automáticamente, por acción posiblemente refleja, yo creo que saqué mi revólver para defenderme, y al mirar así de costado vi un brazo con una cosa que brillaba, como un revólver, que me apuntaba"; que la persona tenía espejuelos color ámbar, vestía traje claro y era un hombre que daba la impresión de ser un hombre de mediana estatura; que después de pasarle la impresión, cuando inició su segunda marcha hacia afuera, vió a un empleado del Capitolio que salía de la rotonda, pero eso fué cuando volvieron a reanudar la marcha; que cuando salieron afuera y bajaron la escalinata que está en la Avenida Ponce de León, no había ninguna persona en la escalinata; que la única persona que apareció después fué el guardián del Capitolio; que el hombre que le apuntó salió corriendo por la parte norte del edificio, donde hay un andamio de maderas; que al salir del edificio se dirigió a la oficina del alcalde, a quejarse de que le hubieran dejado solo, sin que nadie le ayudara en un caso como ése; que por la mañana fué a ver a los abogados del Dr. De Castro para que investigaran, pues a él le parecía que era muy posible que hubiera algún partidario del Dr. De Castro inte-

resado en hacerle daño, sin que De Castro lo supiera; que le encargó al Lic. De la Haba que hablara con De Castro, que le dijera que eso ya no tenía importancia, que lo apreciaba mucho y que lo único que hacía era cumplir con su deber; que vino al tribunal, no con el propósito de traer una querella ni de influir en su ánimo, sino más bien a cambiar impresiones y tal vez a obtener un poco de apoyo en su situación; que al llegar habló con el secretario y con el márshal, quienes le dijeron que habían notado cosas muy raras en la sala, pues había un individuo que se reía de vez en .cuando con el Dr. De Castro y la señora; que con esas palabras vino a ser más grande su inquietud espiritual; que el márshal le preguntó si tenía algún amigo entre los jueces del tribunal y él le contestó que todos eran sus amigos y el márshal entonces le invitó a ver al Juez De Jesús; que él le contó todo al Juez De Jesús y cuando éste le preguntó si quería que transmitiera al tribunal todo lo que él le había dicho, le contestó ''Como usted quiera,'' y el juez creyó que su intención era ésa; que jura solemnemente que nunca estuvo en su mente tratar de influir en la mente del tribunal en su resolución del caso del Dr. De Castro; que algunos meses después de esos sucesos, el día 20 de noviembre de 1940, a la 1.30 de la tarde, encontrándose el declarante en el restaurante ''Estrella de Italia'' vió allí al Senador Felipe Colón Díaz y se acercó a la mesa para saludarle; que en ese momento un individuo que estaba en la mesa se levantó violentamente y le dijo ''Su hermano y su sobrino son unos criminales, yo debería asesinarlo a usted ahora mismo''; que eso sucedió inmediatamente después de habérsele preguntado al declarante si conocía al Sr. Irizarry, y que entonces el declarante se dió cuenta inmediatamente de la situación, retrocedió hacia una ventanilla, se acercó a la pared, cogió su revólver y le contestó: ''Tírese a ver si sale bien''; que entonces intervino el Senador Colón; que además del Senador Colón presenciaron el incidente el Alcalde de Vega Alta y un empleado de la ''Estrella de Italia.''

La evidencia, considerada en conjunto, es a nuestro juicio ampliamente suficiente para justificar las alegaciones de la querella. Los testigos Avilés y Cristian, presentes a la hora y en el sitio del supuesto atentado y en condiciones para darse cuenta del suceso, de haber éste ocurrido, declaran enfáticamente que allí y entonces nada ocurrió que les llamara la atención y que por el contrario vieron al Sr. Valldejuli y a su acompañante Sr. Cestero bajar por la escalera del pasillo de Secretaría, cruzar el vestíbulo y salir a la calle por las puertas de la fachada sur del Capitolio, frente a la Avenida Ponce de León, sin que nada inesperado les ocurriera, caminando y hablando en perfecta paz y tranquilidad. A las declaraciones de estos testigos, cuya presencia en el lugar donde el querellado alega ocurrió el atentado ha sido establecida fuera de toda duda por los testimonios del márshal Látimer y del Lic. Rivera Zayas, el tribunal da entero crédito.

Ha llamado poderosamente la atención del tribunal el hecho de que, no obstante haber dicho a todas las personas a quienes relató el supuesto atentado, que una persona amiga le informó que antes de la vista del caso había visto al que le apuntó con un revólver, en un café en la parada 15 en Santurce, bebiendo en compañía del Dr. de Castro y de su señora, y no obstante haber declarado bajo juramento en la investigación preliminar practicada por orden de esta corte, que cuando él se encontraba informando al "City Manager" de lo sucedido en el Capitolio "allí mismo se informó *por persona que puede identificar,* que antes de la vista del caso ante esta Hon. Corte Suprema, había visto a una persona con traje claro y espejuelos ámbar, parecida a la descrita por mí, en la Parada 15, tomando con el Dr. De Castro," el querellado, al declarar ante esta corte, se abstuvo en absoluto de hacer referencia a ese hecho tan esencial para su defensa y no hizo el menor esfuerzo para traer a presencia de la corte a su informante, a quien él dijo podía identificar, para

que repitiera ante la corte los informes que el querellado utilizó para tratar de conectar no solamente al Dr. De Castro, si que también a su esposa, con la comisión del supuesto atentado contra su vida. La supresión de esa evidencia nos autoriza a presumir o que la misma no existe o que de ser presentada hubiera sido adversa al querellado.

La prueba ofrecida por el querellado, en un esfuerzo tardío para retirar su falsa acusación contra los esposos De Castro y dirigirla contra el hermano del interfecto Irizarry, no es merecedora de crédito alguno, pues de acuerdo con las declaraciones de Avilés y de Cristian, a las que hemos dado crédito, no es cierto que el querellado fuera acometido con un revólver por persona alguna.

La declaración del testigo Cestero no es merecedora de crédito alguno. Este testigo, al ser invitado el 23 de enero de 1940 por el márshal Látimer, para que le señalase el sitio exacto en donde él vió apostado al hombre con el revólver, le señaló la segunda columna a mano izquierda del pasillo, después de bajar la escalera que está junto a la oficina del márshal; y más tarde, ese mismo día, llamó al márshal, rectificó el primer informe que le había dado y trasladó el lugar del suceso a la cuarta columna frente a la escalinata para salir del Capitolio, diciéndole: "Látimer, yo me equivoqué esta tarde cuando le señalé donde había ocurrido el caso; eso fué aquí," señalándole una columna junto a las puertas exteriores del Capitolio. Además, su manera de declarar, la rapidez con que supo aprovecharse de la descripción que del Sr. Irizarry había hecho el Lic. Franco, para aceptarla como la exacta descripción del hombre que había atentado contra el Sr. Valldejuli, sin tener en cuenta que en las descripciones anteriores que de dicha persona hiciera, solamente había podido decir que era un hombre blanco, vestido de "palm beach," que usaba gafas color ámbar, más grandes que las llamadas "gríngolas," que le cubrían todo el ojo; y lo inverosímil de su declaración de que el hombre de las ga-

fas—quien seguramente se las puso para evitar ser reconocido—se las quitó inmediatamente después del atentado, en presencia de Cestero, para que éste pudiese declarar sobre el color exacto de sus ojos, son circunstancias que nos llevan a la conclusión de que su testimonio no merece crédito.

■ Examinemos las cuestiones levantadas por el querellado en su alegato.

Se ha llamado nuestra atención hacia una evidente incongruencia entre la alegación que se hace en la querella de que el Lic. Valldejuli *pidió* al Juez Sr. De Jesús que transmitiera sus manifestaciones a la corte, y la prueba que sólo demuestra que el querellado "*autorizó* a dicho Juez para que así lo hiciera, al decirle 'Como usted quiera.'" La incongruencia carece a nuestro juicio de importancia. Informado un juez de esta corte, por un abogado, de que ha sido agredido, junto al salón de sesiones, al salir de la vista de un caso y por razón de y en relación con ese mismo caso, es el deber del juez que recibe tales informes transmitirlos al tribunal, para que éste pueda cumplir su obligación de dar la debida protección al abogado agredido y hacer respetar su propia dignidad castigando al agresor. No es necesaria ni la petición ni la autorización del abogado para que la corte conozca del caso. En el de autos, el abogado, al autorizar al juez ante el cual acudió en demanda de protección para que transmitiera sus informes al tribunal, se colocó desde ese momento bajo la jurisdicción de la corte y se expuso a ser castigado por desacato si de la investigación que necesariamente debía practicarse resultaba que los hechos por él denunciados eran falsos.

■ Alega el querellado, que en la querella se le imputa que las manifestaciones hechas por él al Juez De Jesús son falsas y que las hizo con la "intención específica" de influir indebidamente a la Corte Suprema en contra del Dr. De Castro; y que esa intención específica no ha sido probada "como un elemento independiente y distinto en la comisión del delito."

Lo que se imputa en la querella es que al hacer el relato del supuesto atentado, el querellado "lo hizo ilegal y voluntariamente y a sabiendas de que tales hechos relatados eran falsos y de que los relataba con el propósito de tender a influenciar indebidamente a los jueces" en contra del Dr. De Castro.

Es cierto que cuando la intención específica (*specific intent*) es un elemento esencial de un determinado delito, esa intención específica debe ser probada para que pueda sostenerse la convicción. Por eso en el caso de *El Pueblo* v. *Pérez*, 48 D.P.R. 725, citado por el querellado, en el que el acusado fué convicto del delito de escalamiento en primer grado, cometido, según se alegó en la acusación, al penetrar en una casa durante las horas de la noche con la intención de cometer violación, se revocó la sentencia porque los hechos probados tendían a negar más bien que a establecer la intención de cometer el delito de violación, y, en ausencia de esa intención, no existía, en consecuencia, el delito de escalamiento. La prueba demostró que Pérez penetró en la casa para verse allí con su novia, quien había convenido abandonar la casa y fugarse con él. De esos hechos no podía inferirse la intención específica de cometer el delito de violación. Si la prueba hubiese demostrado que Pérez había violado a su novia o la había atacado con esa intención, seguramente la sentencia hubiera sido confirmada, pues bastaba el hecho realizado para que del mismo se infiriese la intención con que el acusado había penetrado en la casa. La única manera de probar la malicia, que es la intención de hacer daño a otro, es infiriéndola de las circunstancias del caso. El medio de prueba no es la demostración y sí la inferencia. Véanse: Wharton *Criminal Evidence,* sec 7, 735–9, y Wharton *Criminal Law,* sec. 113 y casos citados en la nota 2.

■■ Establecido fuera de toda duda razonable que los hechos relatados por el querellado al Juez De Jesús y transmitidos por éste a la corte son falsos y que al querellado le

constaba que dichos hechos eran falsos, tenemos que concluir que el propósito que tuvo el querellado al hacer tal falso relato fué el de llevar a la mente del tribunal la idea de que el Dr. De Castro y su esposa eran personas capaces de entrar en una conspiración con un criminal e inducir a éste a atentar contra la vida del querellado, por el solo hecho de que éste había llevado la representación de la parte contraria en el caso pendiente ante la corte. No podía ser, como se pretende, el propósito del querellado buscar protección y seguridad para su persona, pues la prueba ha demostrado que nada absolutamente le ocurrió. Los hechos y circunstancias del caso nos llevan a la ineludible conclusión de que el fin que el querellado se propuso alcanzar con su conducta desdeñosa e irrespetuosa fué el de influir al tribunal en contra del Dr. De Castro. Al querellado no le interesaba que se investigase el supuesto atentado. Lo que sí le interesaba era destilar la gota de veneno en la mente del juzgador, en la esperanza de que su efecto sería prejuiciarle en contra de su adversario.

Los abogados, como funcionarios que son de las cortes de justicia, están más obligados que cualquier otro ciudadano a guardar a las cortes y a sus jueces el debido respeto y consideración. La misión de las cortes y la de los abogados es una sola: llegar al conocimiento de la verdad. El abogado que en vez de cooperar al esclarecimiento de los hechos se empeña en obscurecerlos, y recurre a prácticas engañosas para sorprender al tribunal a inducirle a cometer una injusticia, se hace culpable de conducta desdeñosa e insolente y por tanto de desacato.

En tal virtud, se declara a Juan Valldejuli Rodríguez culpable de desacato al tribunal y se le condena a sufrir quince días de prisión en la Cárcel del Distrito de San Juan, situada en esta ciudad de San Juan y a pagar $50 de multa y las costas.

Así lo pronunció y manda el tribunal y firma el Sr. Juez Presidente.